**ABILENE MUSIC, INC.; Range Road Music, Inc.; and Quartet Music, Inc., Plaintiffs,**

v.

**SONY MUSIC ENTERTAINMENT, INC.; Dennis Coles, p/k/a "Ghostface Killah"; Corey Woods, p/k/a "Raekwon"; and Alan Maman, p/k/a "the Alchemist," Defendants.**

**No. 02 Civ. 2462(GEL).**

United States District Court, S.D. New York.

June 18, 2003.

Bruce Ewing, Dorsey & Whitney LLP, (Marc S. Reiner, on the brief) New York, NY, for Defendant Sony Music Entertainment, Inc.

## OPINION AND ORDER

LYNCH, District Judge.

In this action for copyright infringement, plaintiffs allege that defendants infringed their copyright in the famous song *What a Wonderful World* (*"Wonderful World"*) by issuing an album containing *The Forest,* a rap song that uses the first three lines of *Wonderful World* as its introduction. As defendant Sony Music Entertainment, Inc., ("Sony")[1] has conceded that plaintiffs have established a prima facie case of copyright infringement, Sony's liability turns on whether *The Forest's* quotation of *Wonderful World* constitutes fair use, and therefore does not infringe plaintiffs' copyright. Both sides now seek summary judgment on this issue. For the reasons discussed below, plaintiffs' motion will be denied, and defendant's motion will be granted.

## BACKGROUND

*Wonderful World* and its optimistic take on life and the natural world have proven extremely popular, and it has been frequently recorded, perhaps most famously by Louis Armstrong.[2] *Wonderful World's* lyrics celebrate nature and the beauty of

Jonathan J. Ross, Silverman Shulman & Baker, P.C., New York, NY, for Plaintiffs Abilene Music, Inc., Range Road Music, Inc. and Quartet Music, Inc.

1. The individual defendants have not appeared in this action. (Def. Mem. at 1.) Plaintiffs sought a default judgment against defendant Coles, but that motion remains unresolved due to plaintiffs' failure to comply with the Court's individual rules. *See* Discussion, Part III, below.

2. While plaintiffs' submissions repeatedly mention Armstrong and his association with the song (no doubt because of his musical stature and iconic popularity), and his recording is probably the best-known rendition of the song, Armstrong did not write it, his critical reputation, to put it lightly, does not rest on this recording, and his estate is not involved in this case. Strangely, plaintiffs' submissions nowhere acknowledge *Wonderful World's* actual composers, Bob Thiele (sometimes known as George Douglas) and George Weiss, whose creativity generated the song and hence the copyright.

life, as evidenced by the first verse of the song:

I see trees of green, red roses too

I see them bloom for me and you

And I think to myself, what a wonderful world.

(MacPherson Decl. Ex. A.) Plaintiffs own the copyright to *Wonderful World,* and have granted hundreds of licenses to record and make derivative works of the song in the past few years alone. (Pls. Mem. at 14.)

Despite the song's popularity, not everybody subscribes to its message of a pastoral world of "skies of blue and clouds of white," where all men are brothers and the sound of "babies cryin'' is music to one's ears. (MacPherson Decl. Ex. A.) Thus, in 2001, hip-hop artist Dennis Coles, known professionally Ghostface Killah, a former member of the well-known group WuTang Clan, wrote and recorded *The Forest* for inclusion on an album entitled *Bulletproof Wallets.* (*Id.* ¶ 2.) *The Forest* portrays a dark view of the world by imagining popular cartoon characters in a "wonderland," engaged in acts of violence, sex, and theft. A few of the less scatological or obscene lines will give the flavor of the work:

Bugs still sniffin', Daffy Duck snitchin'

And heard that crazy Bird took the stand on the Simpsons

Bet you "my golly, oh glory" with a story to tell

Droopy got knocked, now he Muslim in jail

His name is Abdrool, Colorful, Snow White tattoo . . . .

(*Id.* Ex. A.) Before beginning its recitation of the evil ends to which even popular cartoon characters can come, *The Forest* opens with an off-key rendition of the first verse of *Wonderful World.* While the singers are unaccompanied and the tempo and rhythm are different from the original, the melody of *Wonderful World* is recognizable. (*Id.*) Coles also changed the lyrics, inserting slang references to marijuana, where the original describes trees and flowers:

I see *buds that are* green, red roses too

I see *the blunts* for me and you

And I *say* to myself, what a wonderful world.

(*Id.*) (emphasis added to alterations). The beat and instrumentals that accompany the rest of the song begin on the word "wonderful," and after a pause, the rap part of the song begins, "It's the illest little story for all the girls and boys/ Wonderland you should see it . . ." (*Id.*) For the rest of *The Forest'* s three-minute duration, it does not repeat the *Wonderful World* quote, or reference the song in any way.

*Bulletproof Wallets* was not a hit by hip-hop standards, selling only 240,000 copies, and grossing $3.5 million. (Ross Decl. Ex. 7.) Nonetheless, plaintiffs were apparently not amused by Ghostface Killah's take on *Wonderful World,* as they sent a notice of infringement to Sony in November 2001. (Ross Decl. Ex. 8.) When the parties were unable to resolve the matter, plaintiffs filed this suit, seeking actual or statutory damages, a permanent injunction against further infringement, destruction of all copies of *The Forest,* and costs and attorneys' fees. (Compl.¶¶ (A)-(E).) As the parties have stipulated that plaintiffs have established a prima facie case of copyright infringement (Ross Decl. Ex. 3), the sole unresolved issue with respect to liability is Sony's affirmative defense of fair use.

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and when, viewing the evidence in the light most favorable to the

nonmoving party, no reasonable trier of fact could disagree as to the outcome of the case. *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir.2000); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). While all ambiguities in the evidentiary record must be resolved in favor of the nonmoving party, "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). In addition, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Courts "should be especially wary of granting summary judgment" in cases involving copyright infringement, because they often are highly fact-dependent. *Leibovitz v. Paramount Pictures Corp.*, 948 F.Supp. 1214, 1217 (S.D.N.Y.1996). This is especially true in fair use cases, as the viability of the defense rests on the particular circumstances of each case and the balancing of various factual considerations. Where none of the material facts are dis-

puted, however, and each party "has contended that its case is complete" by moving for summary judgment, the likelihood that additional, non-cumulative evidence will be presented at trial is slight, and so judgment as a matter of law may be appropriate. *Id.* at 1217–18. In that situation, summary judgment may be granted for one party if the evidence is such that no reasonable juror could render a verdict against that party. *Id.; see also Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir.1992).

## II. *Fair Use*

■ The affirmative defense of fair use fosters artistic dialogue and influence within the copyright regime by protecting authors' rights build upon and transform existing works without having to purchase a license to do so. The concept of fair use has existed "[f]rom the infancy of copyright protection," and "has been thought necessary to fulfill copyright's very purpose" of promoting artistic creation, as borrowing from and commenting upon existing works is a fundamental part of the process of inventing new works. *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 575, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). Thus, section 107 of the Copyright Act of 1976 recognizes fair use as a complete defense to a claim of infringement:

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include -

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107 (2000). In determining whether a given work makes fair use of the copyrighted material of another work, courts are to weight the four statutory factors together, giving none dispositive weight, in light of the purposes of copyright protection. *Campbell,* 510 U.S. at 577–78, 114 S.Ct. 1164. In general, if the new work truly transforms the original work, through comment, criticism, or additional material, it is both more deserving of fair use protection, since it represents true creative effort on the part of its author, and less likely to thwart the purposes of the copyright law by supplanting the market for the original work.

Sony argues that *The Forest* constitutes fair use because it quotes the first few lines of *Wonderful World* in order to parody the song's portrayal of the world as a place of love and happiness. (Def. Mem. at 12.) The Supreme Court has recognized parody as a form of fair use, even though it is not expressly listed among the examples of fair use in § 107, because the very purpose of parody, to comment on or criticize the "substance or style of the original composition" through humor or slapstick, makes it a form of criticism. *Campbell,* 510 U.S. at 580, 114 S.Ct. 1164.

The determination of whether a work constitutes a parody of the original forms part of the consideration of the first fair use factor, the nature and purpose of the use. Once the court decides that the work

at issue is a parody, its consideration of the other factors must be informed by the nature of parodic works in general. Thus, the second factor, the nature of the original work, is not heavily weighted in cases involving parodies, since any work meriting parody is likely to be both well-known and creative enough to be close to the "core of intended copyright protection." *Id.* at 586, 114 S.Ct. 1164. Similarly, because a parody must take recognizable material from the original in order to convey its message, it is more likely to copy the "heart" of the original, and the court must take this into account in its consideration of the third factor, the amount and substantiality of the material used. *Id.* at 588–89, 114 S.Ct. 1164. Finally, because parodies are unlikely to become substitutes for their subjects in the marketplace, "it is more likely that the new work will not affect the market for the original in a way cognizable under [the fourth] factor." *Id.* at 592, 114 S.Ct. 1164. In sum, once a work is determined to be a parody, the second, third, and fourth factors are unlikely to militate against a finding of fair use.

### A. *The Purpose and Character of the Use*

The first factor considers whether the new work's use of the original transforms it in some way by adding something new or commenting on it. *Id.* at 578–79, 114 S.Ct. 1164. Parody "has an obvious claim to transformative value," *id.* at 579, 114 S.Ct. 1164, and thus deciding that the new work is a parody necessarily entails finding that the new work is transformative. In determining whether the new work is a parody of the original, the relevant inquiry is "whether a parodic character may reasonably be perceived." *Id.* at 582, 114 S.Ct. 1164. Thus, contrary to plaintiffs' argument, the question is not

whether Ghostface Killah intended *The Forest* purely as a parody of *Wonderful World* (Pls. Mem. at 8 & n. 22), but whether, considered as a whole, *The Forest* "differs [from the original] in a way that may reasonably be perceived as commenting, through ridicule, on what a viewer might reasonably think" is the unrealistically uplifting message of *Wonderful World. Leibovitz v. Paramount Pictures Corp.,* 137 F.3d 109, 114 (2d Cir.1998). Under this standard, *The Forest* is clearly a parody of *Wonderful World.*

■ The heart of any parody is its evocation of the message or style of the original work in order to alter that message or style in a way that humorously expresses the author's opinion of the original work. *See, e.g., Campbell,* 510 U.S. at 580, 114 S.Ct. 1164 (defining parody). The primary aim of *The Forest* is to portray the modern world as corrupted and venal, and it uses *Wonderful World* to underscore that message, by providing an ironic contrast to the body of the song. While the world of *Wonderful World* is all flowers and light, the world of *The Forest* is a "wonderland" that is hardly wonderful. Thus, just as *The Forest*'s use of cartoon characters pointedly comments on lost innocence and what its author sees as the naivete of mainstream culture, its rendition of *Wonderful World* just before the beginning of the rap is easily understood as commenting on the innocence reflected in the lyrics of the original, in order to drive home its own message more effectively.

To this end, *The Forest*'s quotation of *Wonderful World* is not simply a rote imitation, but makes key changes to the lyrics and to the overall effect of the lines. Where the original first three lines of *Wonderful World* describe the beauty of nature, its "trees" and "roses" in "bloom," *The Forest*'s quotation reads more like an invitation to get high with the singer, celebrating the availability of marijuana, with "buds [and] blunts for me and you." (MacPherson Decl. Ex. B.) Where the most famous recording of *Wonderful World* is lushly orchestrated, with strings playing the melody in a major key, evoking a feeling of peace and harmony, *The Forest*'s version is recited *a cappella,* with a single male singer intoning the words off-key, in a tone that might reasonably be perceived as sarcastic. The final line of the quotation, "And I say to myself, what a wonderful world," sounds positively ominous: While in the original, the melody ascends to the phrase "wonderful world," in *The Forest,* the entire line is intoned on a single note, negating the optimistic, happy feeling created by the original. Although the quotation as a whole is sufficiently recognizable to instantly evoke the original in the listener's mind, the alterations in the lyrics and the music, taken together, present a very different view of the world, and the phrase "wonderful world," in this context, takes on a cynical, ironic meaning. The contrast between the original, recognizable through the alterations, and the drug references and changed harmony, comments on the putative naivete and lack of realism of the original. The juxtaposition is further underscored by the immediate beginning of the rap beat and the description of the "wonderland" of sex, drugs, and prison time that constitutes the remainder of the song. No two worlds could be more different, and the unrelenting seediness of the world portrayed by *The Forest* may be interpreted as both criticizing and ridiculing the cheerful perspective of *Wonderful World.* Thus, *The Forest*'s use of *Wonderful World* is indisputably intended to parody the message of the original, and would be so perceived by any listener familiar with the song.

Moreover, reviews of *Bulletproof Wallets* did indeed so perceive it, discussing *The Forest*'s use of *Wonderful World* in terms of its alteration of the original. One states that the song begins "with a weed-filled rendition of the Louis Armstrong classic," before "spout[ing] out a ghetto-style fairy-tale story gone awry." (Ross Decl. Ex. C.) Others refer to the quote as a "murdering" (*id.* Ex. D) and an "out-of-tune rendition" of the original (*id.* Ex. E). While these reviews do not use the word "parody," their emphasis on the alterations of the original evidences the transformative nature of *The Forest*'s use. Considering the nature of the alterations in the context of the song as a whole, it is clear that *The Forest* parodies the message of *Wonderful World* by altering the original and juxtaposing the quotation with the dark picture presented by the rest of the song.

Plaintiffs argue, however, that *The Forest* cannot be a parody of *Wonderful World*, because it incorporates only three lines of the original, and never returns to it after the initial use in the introduction. (Pls. Mem. at 8.) To constitute a parody, a work must be directed, at least in part, at the original, and its "commentary [must have] critical bearing on the substance or style of the original." *Campbell*, 510 U.S. at 580–81, 114 S.Ct. 1164. A work that appropriates material from an existing work for humorous effect, without directing its criticism or ridicule at the copied work itself, does not have parody's need to appropriate material from the subject work in order to make its point, and is therefore not entitled to the allowances made for parody in considering the other fair use factors. *Id.* at 581 & n. 15, 114 S.Ct. 1164. Plaintiffs' argument is essentially that *The Forest* uses too little of *Wonderful World*, and that therefore it is at best a satire directed at modern society, but not a parody directed at the original itself.

Plaintiffs' argument takes too narrow a view of parody and of the fair use factors. The fair use analysis as a whole avoids quantitative measurements, relying instead on a qualitative examination of the unique characteristics of the work at issue. It is therefore not necessary for a parody to devote a certain proportion of its length to the copied material, focus only on the subject work, or rely entirely on the subject work for its melody or form. Thus, while the "infringed upon musical piece [must] relate, in [some] respect, to the subject … being parodied," it is not necessary "that there be an identity between the song copied and the subject of the parody." *Elsmere Music, Inc. v. Nat'l Broadcasting Co., Inc.*, 482 F.Supp. 741, 746 (S.D.N.Y. 1980), *aff'd* 623 F.2d 252 (2d Cir.1980) (affirming on the "thorough opinion" of the district court). Here, the overall message of *The Forest* is that the world is corrupted and ridden with crime and drugs. In the process of making that point, *The Forest* sets up a contrast between the assertedly delusional innocence of mainstream culture and the purportedly more realistic viewpoint of the rapper, both by using cartoon characters as subjects and by quoting from and parodying *Wonderful World*. While the message of *The Forest* goes beyond simply parodying *Wonderful World*, that parody is an integral part of the song's take on the world because it highlights the contrast between the two worldviews, and expresses the rapper's belief in the realism of his own perspective. Contrary to plaintiffs' argument, therefore, this is not a case in which the author has taken the melody of a popular song purely for the sake of convenience, and then changed the lyrics to satirize a subject having nothing to do with the original song. *Cf. MCA, Inc. v. Wilson*, 425 F.Supp. 443, 453 (S.D.N.Y.1976) ("Defen-

dants may have sought to parody life, or more particularly sexual mores and taboos, but it does not appear that they attempted to comment ludicrously upon Bugle Boy.").[3]

Plaintiffs' argument paradoxically implies that the more of the original that a would-be parodist takes, the more likely that the resulting work will be sufficiently directed at the original to constitute a parody, and thus the more likely to be fair use. Plaintiffs' analysis would create a perverse incentive for parodists to use more of an existing work, in effect making their parody less transformative, thereby undermining the very rationale for according permissive fair use treatment to parodies. It would also result in considerable tension with the third fair use factor, which weighs against fair use if the parodist has taken more of the original than is necessary to evoke it in the minds of the audience. *Campbell,* 510 U.S. at 588–89, 114 S.Ct. 1164 (stating that parodist must take enough to "conjure up" the original, but no more than is necessary). Would-be parodists would then be in the awkward position of attempting to take not too little, nor too much, but just the right amount of the original, a difficulty that could stifle this legitimate form of criticism.

Finally, it bears emphasis that *The Forest'*s alteration of the tone, lyrics and musical features of *Wonderful World* makes clear that the song itself is a target of parodic criticism, and that the creators of *The Forest* are not merely using the original song as an ironic or satirical device to comment on what they view as a less than wonderful world. The latter kind of use, which typically requires licensing, can be illustrated by the song's use in certain films. For example, in Terry Gilliam's *12 Monkeys,* the Armstrong recording of *Wonderful World* is played over the final credits, ironically contrasted with the film's depiction of a distinctly dystopian science fiction future, and in Barry Levinson's *Good Morning, Vietnam,* the song is played on the sound track accompanying scenes of wartime violence and destruction. In these cases, the original song itself is used (essentially in its entirety) to comment on negative aspects of the real or imagined worlds depicted by the filmmakers, but the song itself is not parodied.

Because *The Forest* is a transformative parody of *Wonderful World,* the first factor weighs in favor of a finding of fair use. *Leibovitz,* 137 F.3d at 115.

### B. *Nature of the Original Work*

Sony concedes that *Wonderful World* is a significantly creative work, and therefore resides within the core of copyright protection. (Def. Mem. at 14–15.) This does not weigh heavily against a finding of fair use, however, because in the context of parody, this factor "is not much help . . . in separating the fair use sheep from the infringing goats . . . since parodies almost invariably copy publicly known, expressive works." *Campbell,* 510 U.S. at 586, 114 S.Ct. 1164; *Leibovitz,* 137 F.3d at 115.

---

**3.** Plaintiffs argue that the "use of [*Wonderful World*] is nothing more than a gratuitous add-on, whose only apparent purpose is to grab the listener's attention through the use of the internationally renowned [original's] established commercial appeal." (Pls. Mem. at 8.) This argument is unpersuasive. As *The Forest* is primarily composed of original material that is of an entirely different character than *Wonderful World,* the quotation is clearly not an attempt to gain commercial success while avoiding the drudgery of composing new material. Moreover, it is hardly likely that Ghostface Killah's audience would be more attracted to a rap song because of its exploitation of a traditional pop song like *Wonderful World.*

## C. Amount and Substantiality of the Portion Used

■ The third statutory factor examines the proportion of the original work used in relation to the original work as a whole. *The Forest* takes the "heart" of *Wonderful World*, since, as Sony points out, the opening lines of a song are often its most memorable, and the excerpt repeats almost verbatim the song's signature line, "And I think to myself, what a wonderful world." (Def. Mem. at 16.) Because parody often must quote "the original's most distinctive or memorable features, which the parodist can be sure the audience will know," however, the question is not whether the parodist appropriated the most recognizable parts of the original work, but whether the parodist then took so much additional material that her use becomes unreasonable. *Campbell*, 510 U.S. at 588, 114 S.Ct. 1164. *The Forest* takes nothing beyond the necessary distinctive elements of *Wonderful World*; after the three-line quotation, the song never returns to the music or lyrics of *Wonderful World*. Moreover, every part of the original that *is* used in the parody is modified, in word, melody or style. *The Forest* therefore takes no more than is absolutely necessary to evoke the message of the original and to make its parodic point through the alterations, and so this factor does not weigh against a finding of fair use. *Leibovitz*, 137 F.3d at 116.[4]

## D. The Effect of the Use on the Potential Market for the Original Work

■ The fourth factor considers whether the work at issue, or "unrestricted and widespread conduct of the sort engaged in by defendant," will supplant the potential market for the original. *Campbell*, 510 U.S. at 590, 114 S.Ct. 1164 (internal quotation marks omitted). In general, the more transformative a new work is, the less likely it would be to substitute for the original in the marketplace. Parodies in particular "serve [a] different market function[ ]" than their subjects, making market harm unlikely.[5] *Id.* at 591, 114 S.Ct. 1164. Here, no reasonable jury could find that *The Forest* would cause substantial harm to the market for *Wonderful World*; anyone interested in purchasing a recording of *Wonderful World* would not turn to the three-line, off-key rendition used in *The Forest* instead. *See, e.g., Fisher v. Dees*, 794 F.2d 432, 438 (9th Cir.1986) ("We do not believe that consumers desirous of hearing a romantic and nostalgic ballad such as the composers' song would be satisfied to purchase the parody instead. Nor are those fond of parody likely to consider [the original] a source of satisfaction.").

Where a parodic work goes beyond simple parody and also transposes the original work into a new genre, however, it could have an effect on potential markets for derivative works that recreate the work in

---

4. In contrast, the satiric but non-transformative or non-parodic uses of the song in the films discussed above use the song in its entirety.

5. Plaintiffs argue, citing *Campbell*, that market harm should be presumed in this case, because "the use is purely for commercial gain." (Pls. Mem. at 14.) This is a misreading of *Campbell*, however, which stated only that when the infringing work at issue is a verbatim copy of the original in its entirety,

with no transformative additions—like the unauthorized video recordings at issue in *Sony Corp. of America v. Universal City Studios*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)—commercial harm may be presumed. *Campbell*, 510 U.S. at 591, 114 S.Ct. 1164. The Court specifically distinguished such a case from ones involving parodies and other transformative uses, in which market harm is less likely and therefore may not be presumed. *Id.*

the new genre without parodying it. *Id.* at 593, 114 S.Ct. 1164. In this situation, defendant must also establish that the work will not adversely affect the potential market for non-parody derivative versions of the original. *Id.* Here, plaintiffs argue that *The Forest* could cause substantial harm to the market for rap derivatives of *Wonderful World.*

While Sony has presented little evidence as to *The Forest's* effect, or lack thereof, on the rap derivative market,[6] there is no need to do so, as *The Forest* is not a rap version of *Wonderful World.* In *Campbell,* the Supreme Court held that the defendant would need to present evidence that 2 Live Crew's rap parody of the Roy Orbison song *Pretty Woman* would not supplant the market for rap derivatives of *Pretty Woman. Id.* Unlike *The Forest,* however, 2 Live Crew's version of the song relied on the original for its bass line, form, and refrain; the product was therefore not only a parody of the original, but a transposition of the major elements of the work into a different musical genre. In contrast, *The Forest's* rendition of *Wonderful World* is simply a quotation that stays relatively true to the melody, form, and genre of the original; only after finishing the quotation does the song's hip-hop beat and rap-style lyrics begin. Thus, the quotation is distinct from the rest of *The Forest,* and the only alterations of its style and lyrics – those necessary to parody the original – do not transform it into a rap song. Because *The Forest* does not transpose *Wonderful World* into the hip-hop

genre, it could not possibly supplant the market for non-parody hip-hop versions of *Wonderful World.*[7]

Because there is no evidence that *The Forest's* use of *Wonderful World* will cause substantial market harm to the original, the fourth factor favors a finding of fair use. *Leibovitz,* 137 F.3d at 116–17.

### E. *Aggregate Assessment*

Given the small portion of *Wonderful World* quoted in *The Forest,* and the transformative nature of the song's use, Ghostface Killah's parody presents little danger of impairing plaintiffs' right to exploit their copyright. Disallowing this use of *Wonderful World* would contravene copyright's purpose of allowing new works to acknowledge influence and react to what has gone before, and would allow copyright owners to quash parodies and other forms of transformation and comment of which they do not approve.

Thus, it is not surprising that the statutory fair use factors weigh heavily in favor of a finding of fair use. The first and fourth factors favor fair use. While the second factor weighs against fair use, its importance is limited in parody cases, *id.* at 117, and the third factor does not weigh heavily either way. Weighing these factors in light of the purposes of copyright protection, moreover, it is clear that suppressing the message of *The Forest,* however unpleasant that message might be, would discourage creative expression without providing any meaningful protection or

---

6. Sony argues that the fact that plaintiffs have granted a license to record a hip-hop version of the song to only one hip-hop artist establishes that there is no market for rap derivatives of *Wonderful World.* (Def. Mem. at 19.) The fourth factor analysis is based on *potential* markets as well as existing ones, however, since a copyright owner should have the right to choose when to enter a new market, or not

to enter it at all. *Campbell,* 510 U.S. at 593, 114 S.Ct. 1164.

7. Once again, the non-parodic use of the song in films provides a pointed contrast. A reasonable fact-finder could infer that each ironic use of the song in a sardonic film reduces the likelihood that future filmmakers will seek to license the song for similar purposes.

encouragement to the original creative artists, the market for whose work remains vast, and entirely unaffected by defendants' largely unheard discordant note. As the balance of the factors "markedly favors the defendant," *The Forest's* quotation of *Wonderful World* is fair use, and plaintiffs' copyright has not been infringed.

### III. *Default Judgments Against the Individual Defendants*

The individual defendants never appeared in this action. Accordingly, plaintiffs filed a request for a default judgment against defendant Coles in September 2002.[8] Although advised by this Court of its individual procedures for obtaining default judgments, plaintiffs never complied with those procedures, and a default judgment against Coles was therefore never entered. In light of the Court's conclusion that plaintiffs' copyright has not been infringed, plaintiffs are not entitled to a default judgment against any of the individual defendants.

### CONCLUSION

Plaintiffs' motion for summary judgment, and their request for a default judgment against Coles, are denied. Defendant Sony's motion for summary judgment is granted. The Clerk is respectfully directed to enter judgment for defendants, and to close the case.

SO ORDERED.

---

8. Plaintiffs have not attempted to obtain default judgments against the other two individual defendants.